**ARISTOTLE P., et al., Plaintiffs,**

v.

**Gordon JOHNSON and Gary Morgan, Defendants.**

No. 88 C 7919.

United States District Court, N.D. Illinois, E.D.

Sept. 7, 1989.

---

## MEMORANDUM OPINION AND ORDER

ANN C. WILLIAMS, District Judge.

The seven plaintiffs bring this three count complaint on the behalf of a class of similarly situated children pursuant to 42 U.S.C. § 1983 alleging that the defendants Gordon Johnson and Gary Morgan violated their rights under the First and Fourteenth Amendments and under the Adoptive Assistance and Child Welfare Act of 1980, 42 U.S.C. §§ 620–628, 670–679 ("AAA"). The defendants move to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the following reasons, the court will grant the defendants' motion in part and deny the motion in part.

## I
### Rule 12(b)(6)

When ruling on this motion, pursuant to Federal Rule of Civil Procedure 12(b)(6), the court will "take the allegations in the complaint to be true and view them, along with the reasonable inferences to be drawn from them, in the light most favorable to the plaintiff." *Ellsworth v. City of Racine*, 774 F.2d 182, 184 (7th Cir.1985); *cert. denied*, 475 U.S. 1047, 106 S.Ct. 1265, 89 L.Ed.2d 574 (1986). A complaint should be dismissed only when "it appears beyond doubt that the plaintiff is unable to prove any set of facts which would entitle plaintiff to relief." *Id.* A "court must construe pleadings liberally, and mere vagueness or lack of detail does not constitute sufficient grounds for a motion to dismiss." *Strauss v. City of Chicago*, 760 F.2d 765, 767 (7th Cir.1985). Moreover, "in 'complex cases involving fundamental rights and important questions of public policy, such preemptory treatment [as dismissal] is rarely appropriate.' " *DeMallory v. Cullen*, 855 F.2d 442, 445 (7th Cir.1988), *quoting Rutan v. Republican Party of Illinois*, 848 F.2d 1396, 1414 (7th Cir.1988) (Ripple, J., concurring in part, dissenting in part).

The pertinent factual allegations of the complaint are as follows. The plaintiffs are children who are wards of the court and are under the guardianship of the Illinois Department of Children and Family Services ("DCFS"). On September 15, 1988, when the complaint was filed, the plaintiffs ranged in age from one year to eighteen years old. The defendant Johnson, who is sued in his official capacity, is the Director of DCFS. He is responsible for developing, implementing, and administering the programs and practices of DCFS and for ensuring that DCFS' practices comply with all constitutional and statutory provisions. The defendant Morgan, who is also sued in his official capacity, is the Guardianship Administrator of DCFS. Morgan is responsible for establishing policies and procedures to provide adequate care and protection to children in placement. The plaintiffs challenge the defendant's practices of placing siblings in separate foster homes or residential facilities and denying the plaintiffs the opportunity to visit their sisters and brothers who are placed elsewhere. Complaint, ¶ 3.

With the exception of the plaintiff Aristotle P., all of the Children were involuntarily removed from their families' homes by DCFS.[1] Each of the plaintiffs were physically separated from their siblings. This separation caused the plaintiffs to suffer emotional harm. Complaint, ¶¶ 29, 31, 39, 41, 51, 69. DCFS had knowledge of the childrens' woes. *Id.* at ¶¶ 29, 31, 39, 41. Some of the plaintiffs' foster parents informed DCFS of their willingness to facilitate visits between their foster children and his or her siblings. *Id.* at ¶¶ 34, 70. Notwithstanding this, DCFS has either refused to arrange sibling visits [2] or has provided for them on an infrequent basis.[3] Mary Freeman, a DCFS worker, stated that DCFS is mandated to provide only parent and child visits. *Id.* at ¶ 54. The DCFS foster homes operated by Ada McKinley have a practice of prohibiting anyone, including relatives of their foster children, from coming into their foster homes. The McKinley homes also prohibit foster children from visiting other homes including those of their relatives. The defendants are aware of McKinley's practice and support it. *Id.* at ¶¶ 70–72. The plaintiffs seek a declaratory judgment that DCFS' practices violate the First and Fourteenth

---

**1.** DCFS gained custody of Aristotle P. and his twin brother Andre pursuant to what their guardian grandmother believed to be a voluntary and temporary agreement. Complaint, ¶ 19. Their grandmother believed that she could regain custody of her grandsons whenever she wished. *Id.* at ¶ 20. Some years later, the grandmother expressed her intent to regain custody of the brothers. DCFS refused her request and instead attempted to arrange the brothers' adoption. *Id.* at ¶ 24. At this point, given the wishes of their former guardian, Aristotle and Andre were involuntarily in DCFS' custody.

**2.** *See* Complaint, ¶¶ 32, 33, 34, 43, 54, 55, 68, 70, 88.

**3.** *See* Complaint, ¶¶ 52, 77, 81.

Amendments and the AAA. They also seek injunctive relief.[4]

## II

### Count I: First Amendment Freedom of Association

In Count I of the complaint, the plaintiffs contend that the defendants' practices of placing siblings in separate placements and then failing to provide visits among siblings on a reasonable basis violates their right to freedom of association under the First Amendment as applied to the state through the Fourteenth Amendment. Their theory is predicated on the Supreme Court's decision in *Roberts v. United States Jaycees*, 468 U.S. 609, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984). In *Roberts*, the Court noted that it has "referred to constitutionally protected 'freedom of association' in the two distinct senses." *Id.* at 617, 104 S.Ct. at 3249. Freedom of association, as defined by one line of decisions, protects "choices to enter into and maintain certain intimate human relationships ... against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme." *Id.* at 617–18, 104 S.Ct. at 3249. The relationship between two family members is the paradigm of such intimate human relationships. *See Id.* at 618–19, 104 S.Ct. at 3249–50. "In this respect, freedom of association receives protection as a fundamental element of personal liberty." *Id.* at 618, 104 S.Ct. at 3249.[5] The Children base their rights of freedom of association on the above language.

The Supreme Court has cited *Roberts* for the proposition that the First Amendment embraces both variants of the right of freedom of association. *See City of Dallas v. Stanglin*, —— U.S. ——, 109 S.Ct. 1591, 1594, 104 L.Ed.2d 18 (1989) ("While the First Amendment does not in terms protect a 'right of association,' our cases have recognized that it embraces such a right in certain circumstances"); *Board of Directors of Rotary International v. Rotary Club of Duarte*, 481 U.S. 537, 545, 107 S.Ct. 1940, 1945, 95 L.Ed.2d 474 (1987) "The First Amendment protects those relationships, including family relationships ..."). Notwithstanding the *Rotary International* and the *Stanglin* decisions, some lower courts have interpreted *Roberts* to find that the right to enter into and maintain certain private, intimate relationships is guaranteed by the Due Process Clause of the Fourteenth Amendment. *See IDK, Inc. v. County of Clark*, 836 F.2d 1185, 1192 (9th Cir.1988); *Trujillo v. Board of County Commissioners*, 768 F.2d 1186, 1188–89 n. 4 (10th Cir.1985); *Kukla v. Village of Antioch*, 647 F.Supp. 799, 806 (N.D. Ill.1986) (Moran, J.); *see also, Mayo v. Lane*, 867 F.2d 374, 375 (7th Cir.1989) ("The concept of liberty in the Fourteenth Amendment has been held to embrace a right to associate with one's relatives"), Linder, *Freedom of Association After Roberts v. United States Jaycees*, 82 Mich.L. Rev. 1878, 1884–85 (1984).

The chronological order in which the various decisions were issued provides one possible explanation for the divergent views as to which amendment protects the first variant of the right to freedom of association. The *Stanglin* case was decided after all of the lower court cases cited above. Nevertheless, even the members of the Supreme Court are not in unanimous agreement on this question. *See Stanglin*, 109 S.Ct. at 1597 (Steven, J., concurring). This court finds that the childrens' relationships with their siblings are the sort of "intimate human relationships" that are afforded "a substantial measure of sanctuary from unjustified interference by the State."

---

4. As the Supreme Court recently noted, a state official sued for injunctive relief in his or her official capacity is a "person" under § 1983. *See Will v. Michigan Department of State Police*, —— U.S. ——, 109 S.Ct. 2304, 2311 n. 10, 105 L.Ed.2d 45 (1989). Thus, the plaintiffs' suit is not barred by the provisions of the Eleventh Amendment.

5. Freedom of association, in the second sense, "recognize[s] a right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion." *Id.*

*Roberts,* 468 U.S. at 618, 104 S.Ct. at 3250; *see Trujillo,* 768 F.2d at 1189 n. 5 (the siblings' "relationships at issue clearly fall within the protected range" established in *Roberts* ); *Cf. Rode v. Dellarciprete,* 845 F.2d 1195, 1204–05 (3d Cir.1988) (relationship with brother-in-law, a non-blood relative, is not protected).[6] The plaintiffs' relationships with their siblings are even more important because their relationships with their biological parents are often tenuous or non-existent. *See* Complaint, ¶¶ 44–46, 48, 61, 67, 75, 83.

The defendants' policies, which allegedly infringe on the plaintiffs' constitutionally protected right to associate with their siblings, must be evaluated under a heightened level of scrutiny. See *Stanglin,* 109 S.Ct. at 1594; *Buckley v. Valeo,* 424 U.S. 1, 25, 96 S.Ct. 612, 637, 46 L.Ed.2d 659 (1976). The defendants, as state actors, may infringe on an individual's right to associate if they have a sufficiently compelling interest that "cannot be achieved through means significantly less restrictive of associational freedoms." *Roberts,* 468 U.S. at 623, 104 S.Ct. at 3252. The plaintiffs do not challenge the defendants' action which removed them from their parents or initial guardians and placed them in DCFS' custody. Accordingly, the court presumes that the defendants had a compelling interest in removing the plaintiffs from their initial home environment. However, in light of the policies at issue here, the question of whether the defendants could protect their compelling interest in a manner significantly less restrictive of associational freedoms is an open one. The plaintiffs argue that a DCFS policy which allowed and facilitated sibling visits would be less restrictive of

associational freedoms. Such a policy would also further promote the compelling interest of protecting the children from harm.[7] This question must be taken up at a latter stage in the proceedings.

■ The defendants also move for dismissal on the grounds that the plaintiffs have failed to make sufficient allegations of intent. The defendants are sued in their official capacities. "Official capacity suits ... 'generally represent only another way of pleading an action against an entity of which an officer is an agent.' " *Kentucky v. Graham,* 473 U.S. 159, 165, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985), *quoting Monell v. Department of Social Services of City of New York,* 436 U.S. 658, 690, n. 55, 98 S.Ct. 2018, 2035 n. 55, 56 L.Ed.2d 611 (1978). An entity will be liable under § 1983 when its policy or custom causes the injury in question. *See City of Canton v. Harris,* —— U.S. ——, 109 S.Ct. 1197, 1203, 103 L.Ed.2d 412 (1989); *Monell,* 436 U.S. at 694–95, 98 S.Ct. at 2037–38. A showing of "deliberate indifference" is sufficient to sustain a § 1983 action against a government entity. *See Canton,* 109 S.Ct. at 1206; *B.H. v. Johnson,* 715 F.Supp. 1387, 1398 (N.D.Ill.1989) (Grady, J.) (same).

■ The allegations of the complaint, read in the light most favorable to the plaintiffs, establish that the defendants enforced and maintained their policies regarding sibling visitation notwithstanding their knowledge that these policies were causing severe emotional harm to the plaintiffs. The allegations support an inference that the defendants were deliberately indifferent toward the plaintiffs' rights. *See, e.g., Richardson v. Penfold,* 839 F.2d 392, 395

---

**6.** The defendants cite the Seventh Circuit's decision in *Bell v. City of Milwaukee,* 746 F.2d 1205 (7th Cir.1984) for the proposition that the plaintiffs have no liberty interests in the relationships with siblings. In *Bell,* the Seventh Circuit held that the plaintiffs could not bring a § 1983 action to secure the damages suffered when the state caused the loss of their siblings' society and companionship. *Id.* at 1247. Notwithstanding its holding, the court "fully recognize[d] the importance of intrafamily relationships generally, including those between siblings." *Id.* Moreover, the Court, in a manner more fully discussed later, stated that the Four-

teenth Amendment could be used to strike statutes which sever relationships between siblings. *Id.* at 1246–47. Finally, the court decided the case under the Fourteenth Amendment and made no mention of the *Roberts* decision which was decided approximately two months before *Bell.* For these reasons, the court finds that the *Bell* decision does not foreclose the plaintiffs' First Amendment claim.

**7.** As stated above, the plaintiffs allege that the defendants' policies regarding sibling visitation have caused them to suffer emotional harm.

(7th Cir.1988) (deliberate indifference is proven by showing actual intent or recklessness. An actor is reckless when he or she disregards a substantial and known risk of danger). Accordingly, the court finds that the plaintiffs have stated a § 1983 claim for the defendants' violation of their First Amendment Rights.

### III

*Count II: Substantive Due Process*

The plaintiffs contend that the defendants violated their substantive due process rights as guaranteed by the Fourteenth Amendment in Count II of their complaint. The defendants move to dismiss this count on the grounds that the plaintiffs do not have a Fourteenth Amendment liberty interest in their relationships with their siblings. They rely primarily on the Seventh Circuit's decision in *Bell*. The *Bell* decision, as this court interprets it, does not stand for the proposition that a liberty interest in a sibling relationship will *never* be protected by the Fourteenth Amendment. The Seventh Circuit was careful to distinguish between awarding money damages and providing other forms of relief. As the court stated,

> [w]e can conceive of potential state statutes severing relationships between siblings (though likely not effecting a severance as irreversible and egregious as the one resulting from the shouting and killing at issue). Such statutes should be stricken as being arbitrary and unreasonable, *but this approach is not the equivalent* of awarding damages under Section 1983 and the Fourteenth Amendment for the loss of society and companionship of a sibling, state law being entirely subsumed in the process.

*Bell*, 746 F.2d at 1246–47 (emphasis added). Moreover, the fact that Wisconsin state law did not allow siblings to recover for loss of society and companionship was not, as the defendants contend, merely "incidental" to the court's holding. *See Id.* at 1247 ("the legal consequences of many important relationships, including family relationships, are often governed by State law, and here

the Wisconsin legislature has expressly decided that no tort recovery is in order").

Supreme Court and subsequent Seventh Circuit caselaw provides further support for the proposition that the Fourteenth Amendment embraces a right to associate with one's relatives. *See Moore v. East Cleveland*, 431 U.S. 494, 500–04, 97 S.Ct. 1932, 1936–38, 52 L.Ed.2d 531 (1977) (plurality opinion); *Mayo*, 867 F.2d at 375 (appellant's argument "that her natural liberty includes a right of association with members of her family, such as [her] grandnephew … is not a frivolous argument"); *Bergren v. City of Milwaukee*, 811 F.2d 1139, 1144 (7th Cir.1987). As the Seventh Circuit noted in *Bergren*, "[t]here can be no question that the 'integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment.'" *Bergren*, 811 F.2d at 1144, *quoting Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 1213, 31 L.Ed.2d 551 (1972). In *Moore*, the court stated that "[o]ur decisions establish that the Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in this Nation's history and tradition." *Moore*, 431 U.S. at 503, 97 S.Ct. at 1938; *see also Philadelphia Police and Fire Association for Handicapped Children, Inc. v. City of Philadelphia*, 874 F.2d 156, 165 (3d Cir.1989) (the court, in reliance on *Moore*, recognized a fundamental right to family integrity).

In *Bell*, the Seventh Circuit relied on *Moore* to find that a state statute which severs relationships between siblings should be stricken. *Bell*, 746 F.2d at 1246. The defendants contend that they have not severed the plaintiffs' relationships in the manner contemplated by the Seventh Circuit. Defendants' Reply, at 6. While the court did not precisely determine what sort of severance would suffice, it did state that such a severance need not be irrevocable and as egregious as one resulting from a siblings' death at the hands of a state actor. *Bell*, 746 F.2d at 1247. In this case, the defendants' policies, resulted in the physical separation of the plaintiffs and

their siblings for extended periods of time.[8] One plaintiff specifically alleges that he was unable to maintain a relationship with two of his siblings because of DCFS' visitation policies. Complaint, ¶ 82. In another instance, one plaintiff has never even had the opportunity to develop a relationship with her siblings because the sisters were infants when taken into DCFS' custody and DCFS has never arranged for visitation between them. *Id.* at ¶¶ 85–88. Thus, the defendants' policies have seriously damaged, if not severed, the relationships between the plaintiffs and their siblings.

█ The defendants further contend that the plaintiffs have failed to specifically allege that their actions were arbitrary and unreasonable. Defendants' Reply, at 6. This is true. However, there are no allegations in the complaint which suggest that the defendants' policies are based in reason. The defendants' support of Ada S. McKinley's foster home policies as well as their failure to facilitate visits when the foster parents have expressed their willingness to cooperate seem to be particularly unreasonable. Of course, the complaint presents only the plaintiffs' side of the story. The defendants will have the opportunity to present their side of the story at a latter stage of these proceedings. The pertinent consideration at this point is that the plaintiffs have sufficiently alleged the existence of a policy which deprives their liberty interests in their sibling relationships by severing these relationships. The court may grant relief on this claim. *Bell*, 746 F.2d at 1205.

The second prong of the plaintiffs' substantive due process argument is based on the fact that they were involuntarily taken into the State's custody. The plaintiffs seek to analogize their situation to incarceration or institutionalization. The Supreme Court has held that the State has an affirmative duty to assume some responsibility for the safety and general well-being of those who are incarcerated or involun-

tarily institutionalized. *See DeShaney v. Winnebago County Department of Social Services,* —— U.S. ——, 109 S.Ct. 998, 1004–06, 103 L.Ed.2d 249 (1989) (citing to *Estelle v. Gamble,* 429 U.S. 97, 103–04, 97 S.Ct. 285, 290–91, 50 L.Ed.2d 251 (1976) and *Youngberg v. Romeo,* 457 U.S. 307, 316–17, 102 S.Ct. 2452, 2458–59, 73 L.Ed.2d 28 (1982)). In *DeShaney,* the Court expressed "no view on the validity of the analogy" between the circumstances of children whom the state removes from free society and places in a foster home operated by its agents and the circumstances of those who are incarcerated or institutionalized. *De-Shaney,* 109 S.Ct. at 1006 n. 9. The Seventh Circuit has also failed to express a definite opinion on the validity of the plaintiffs' analogy. *See Doe v. Bobbitt,* 881 F.2d 510, 512 (7th Cir.1989). However, the Second and Eleventh Circuits as well as Judge Grady from this District have found that the plaintiffs' analogy is a valid one. *See Doe v. New York City Department of Social Services,* 649 F.2d 134, 141–42 (2d Cir.1981), *appeal after remand,* 709 F.2d 782 (2nd Cir.), *cert. denied,* 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983); *Taylor ex rel. Walker v. Ledbetter,* 818 F.2d 791, 794–97 (11th Cir.1987) (en banc), *cert. denied,* —— U.S. ——, 109 S.Ct. 1337, 103 L.Ed.2d 808 (1989); *B.H.,* 715 F.Supp. at 1396; *see also Gibson v. Merced County Department of Human Resources,* 799 F.2d 582, 589–90 (9th Cir.1986) (assumes, without expressly holding, that the *Doe* analogy is proper).

The defendants object to the extension of the *Youngberg–Estelle* principles to the circumstances of this case. The defendants rely principally on the Second Circuit's decision in *Black v. Beame,* 419 F.Supp. 599 (S.D.N.Y.1976), *aff'd,* 550 F.2d 515 (2d Cir. 1977). In *Black,* the district court noted that "[t]here is no constitutional obligation on the State either to provide plaintiffs with welfare or housing benefits or to affirmatively insure a given type of family life...." *Id.* at 607. The relief sought by

---

8. DCFS arranged for the plaintiff Richard to have only six visits with three of his siblings over a twelve year period of time. Complaint, ¶ 77. Other plaintiffs have gone for periods of at least fifteen and seventeen months without having a visit with their siblings. *Id.* at ¶¶ 33, 37, 43.

the plaintiffs in *Black* was more expansive than the relief sought in this case. More importantly, the children in *Black* were *voluntarily* placed into foster care by their mother. *Id.* at 602, 606; *see Milburn v. Anne Arudel County Department of Social Services*, 871 F.2d 474, 476 (4th Cir. 1989) (the court notes the distinction between voluntary and involuntary placement into a foster home). The court emphasized that "[t]here [was] no claim that the four plaintiffs in foster care were pulled involuntarily from their home by the State...." *Id.* at 606. In this case, the plaintiffs were involuntarily taken from free society. In *Black*, the court also held that it "ha[d] the power to insure that no state agency improperly interfere[d] in the Black's family life." *Id.* at 607 (emphasis in the original). The plaintiffs here allege here that the defendants' policies are improperly interfering with their family right by depriving them of their liberty interest in their sibling relationships. The *Black* decision is distinguishable for these reasons.[9]

After reviewing the pertinent authority, the court finds that the *Taylor* and *Doe* decisions are persuasive and will follow them.[10] In *Taylor*, the court held "that a child involuntarily placed in a foster home is in a situation so analogous to a prisoner in a penal institution and a child confined in a mental health facility that the foster child may bring a section 1983 action for violation of fourteenth amendment rights." *Taylor*, 818 F.2d at 797; *see also Philadelphia Police*, 874 F.2d at 168, *quoting DeShaney*, 109 S.Ct. at 1006 ("a 'state's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint on personal liberty' is a

prerequisite to the state's obligation to provide care"). The *Taylor* court based its decision in main part on the "risk of harm" that the helpless, isolated children are exposed to in foster homes. *Id.* The court also made note of society's rising consciousness and stated that "it is time that the law [should] give to these defenseless children at least the same protection afforded adults who are imprisoned as a result of their own misdeeds." *Id; see Doe*, 649 F.2d at 145.

This court is further persuaded to accept the above reasoning after a review of the Seventh Circuit's decision in *DeShaney* where the court intimated its approval of *Doe*. In *DeShaney*, the plaintiffs sued the defendant county department of social services alleging that it recklessly failed to protect the minor plaintiff from his father's child abuse. The minor plaintiff was in the custody of his father at all pertinent times. The Seventh Circuit stated that "[h]ad Joshua (the minor plaintiff) been a foundling in the custody of the state, which then placed him with foster parents who it knew or strongly suspected would abuse the child, this case would be like *Doe*." *DeShaney*, 812 F.2d at 303.

■ The court finds that the plaintiffs have a substantive due process right under the Fourteenth Amendment

> to be free from unreasonable and unnecessary intrusions upon their physical and emotional well-being, while directly or indirectly in state custody, and to be provided by the state with adequate food, shelter, clothing and medical care ...

*B.H.*, 715 F.Supp. at 1396. The plaintiffs have stated a claim for the violation of their substantive due process clause by

---

**9.** The defendants also cite to the district court's decision in *Child v. Beame*, 412 F.Supp. 593 (S.D.N.Y.1976) to buttress their contentions. The *Child* Court found the attempt to equate the status of children under foster care with those who have been institutionalized or incarcerated to be "somewhat farfetched." *Id.* at 608. In light of the Second Circuit's decision in *Doe*, any persuasive value that the *Child* decision may have initially had has been greatly, if not entirely, eroded. *See Doe*, 649 F.2d at 141–142. Moreover, the *Child* plaintiffs were challenging the fact or duration of their custody rather than

the conditions under which they are living as are the plaintiffs in this case. The court will not follow the *Child* decision for these reasons.

**10.** The court notes that it must give "substantial weight" to these decisions from the Second and Eleventh Circuits even though they are not necessarily controlling. *See Richards v. Local 134, International Brotherhood of Electrical Workers*, 790 F.2d 633, 636 (7th Cir.1986); *NuPulse, Inc. v. Schlueter Co.*, 853 F.2d 545, 550–51 (7th Cir. 1988).

alleging that the defendants, with deliberate indifference,[11] pursued policies which caused them injuries by impairing their relationships with their siblings. The fact that the plaintiffs' injuries are psychological rather than physical is of no moment. *See White v. Rochford,* 592 F.2d 381, 385 (7th Cir.1979) (citing to *Carey v. Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978)) ("the protections of the Due Process Clause against arbitrary intrusions on personal security includes [sic] both physical and emotional well-being"); *Crawford v. Garnier,* 719 F.2d 1317, 1324 (7th Cir.1983) (personal distress and emotional pain and suffering while "very subjective matter ... [are] compensable" under § 1983); *Mendez v. Rutherford,* 655 F.Supp. 115, 118 (N.D. Ill.1986).

When determining whether the plaintiffs' substantive due process rights "ha[ve] been violated, it is necessary to balance 'the liberty of the individual[s]' and 'the demands of an organized Society.'" *Youngberg,* 457 U.S. at 320, 102 S.Ct. at 2460, *quoting Doe v. Ullman,* 367 U.S. 497, 542, 81 S.Ct. 1752, 1776, 6 L.Ed.2d 989 (1961) (Harlan, J., dissenting). The balancing of these interests is entrusted to professionals and is not "left to the unguided discretion of a judge or jury." *Id.*[12] The court must first determine whether professional judgment was exercised when the policies at issue were devised and implemented. *Id.* The decision with respect to the policies, "if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* at 323,

102 S.Ct. at 2462. This is a deferential standard. *Id.* at 321–23, 102 S.Ct. at 2461–62. However, this issue cannot be resolved on the defendants' motion to dismiss. *See, e.g., Gibson,* 799 F.2d at 590. Accordingly, the defendants' motion to dismiss Count II of the complaint is denied.

*Count IV: Violation of the Adoption Assistance and Child Welfare Act of 1980*

In Count III, the plaintiffs allege that the defendants' policies violate the AAA by not requiring the development of a case plan that ensures placement in the least restrictive, most family like setting, consistent with a child's best interests and special needs. The plaintiffs further allege that the defendants have violated the AAA by not making reasonable efforts to reunify their families. The defendants move to dismiss this count asserting that there are several hurdles which stand in the way of the plaintiffs' efforts to state a valid cause of action under this statute. While the court does not find all of the supposed hurdles to be insurmountable, it does agree that this count must be dismissed.

The plaintiffs bring this action under § 1983.[13] The court must first determine whether the AAA creates any enforceable rights under § 1983. "Since 1871, when it was passed by Congress, § 1983 has stood as an independant safeguard against deprivations of federal constitutional and statutory rights." *Smith v. Robinson,* 468 U.S. 992, 1012, 104 S.Ct. 3457, 3468, 82 L.Ed.2d 746 (1984). The Supreme Court has "recognized two exceptions to the application of § 1983 to remedy statutory violations: where Congress has foreclosed such enforcement of the statute in the enactment itself and where the statute did not create

11. *See supra,* at 1006 (discussion of how complaint sufficiently alleges deliberate indifference).

12. A professional decisionmaker, as the Court noted, is "a person competent, whether by education, training or experience, to make the particular decision at issue." *Id.* at 323 n. 30, 102 S.Ct. at 2462 n. 30.

13. The court acknowledges that the analysis used to determine whether a federal statute creates rights that are enforceable under § 1983 "resembles" the analysis used to determine whether an implied right of action may be implied from such a statute. *See Polchowski v. Gorris,* 714 F.2d 749, 751 (7th Cir.1983). The court, however, will not discuss the implied right of action analysis developed in *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975) because the plaintiffs assert their claim solely under § 1983.

enforceable rights, privileges, or immunities within the meaning of § 1983." *Wright v. City of Roanoke Redevelopment and Housing Authority*, 479 U.S. 418, 423, 107 S.Ct. 766, 770, 93 L.Ed.2d 781 (1987). When making this determination, the court is aware that "[t]he crucial consideration is what Congress intended." *Smith*, 468 U.S. at 1012, 104 S.Ct. at 3468. The defendants bear the burden of demonstrating that Congress intended to preclude reliance on § 1983 as a remedy for the deprivation of a federally secured right. *Wright*, 479 U.S. at 423–24, 107 S.Ct. at 770–71 This conclusion is not easily drawn. *Id.*

■ The defendants assert that Congress foreclosed the enforcement of any AAA rights under § 1983. Specifically, they contend that the AAA's remedial devices are "sufficiently comprehensive ... to demonstrate Congressional intent to preclude the remedy of suits under § 1983." *Middlesex County Sewage Authority v. National Sea Clammers Association*, 453 U.S. 1, 20, 101 S.Ct. 2615, 2626, 69 L.Ed.2d 435 (1981). The Section 671(b) of the AAA allows the Secretary of the Department of Health and Human Services to withhold or reduce the federal funds paid to a state when the state plan fails to comply with § 671(a) or when there is a substantial failure to substantially comply with the terms of the plan. 42 U.S.C. § 671(b). The AAA also makes provisions for administrative hearings. *Id.* The court finds that these remedial provisions are insufficient to demonstrate the requisite Congressional intent.

As an initial matter, "generalized powers" such as the ability to cut off federal funds, "are insufficient to indicate a congressional intention to foreclose § 1983 remedies." *Wright*, 479 U.S. at 428, 107 S.Ct. at 773, *Cf. Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 28, 101 S.Ct. 1531, 1545, 67 L.Ed.2d 694 (1981). Moreover, the absence of a private judicial remedy within the AAA statutory scheme is persuasive evidence that Congress did not intend to foreclose a § 1983 remedy. *See Wright*, 479 U.S. at 427, 107 S.Ct. at 772 (citing to *Sea Clammers* and *Smith*). Finally, the First and Fourth Circuits along with at least two district courts have held that a § 1983 action may be brought for the violation of certain rights guaranteed by the AAA. *L.J. v. Massinga*, 838 F.2d 118, 123 (4th Cir.1988); *Lynch v. Dukakis*, 719 F.2d 504, 509–12 (1st Cir. 1983); *Joseph A. by Wolfe v. New Mexico Department of Human Services*, 575 F.Supp. 346, 353 (N.N.M.1983); *B.H.*, 715 F.Supp. at 1403–04; *see also, Spielman v. Hildebrand*, 873 F.2d 1377, 1386 (10th Cir. 1989).

The remaining question is the exact nature of the enforceable rights provided by the AAA. The defendants contend that the rights that the plaintiffs seek to enforce are more expansive than the rights found enforceable by any other court. They are correct. For example, in *Lynch* the First Circuit held that the plaintiffs "could maintain a § 1983 action for prospective injunctive relief where it has alleged that the state had not complied with the statutorily mandated procedure of developing and periodically reviewing case plans for the children under its supervision." *Scrivner*, 816 F.2d at 263 (citing to *Lynch* with approval). The court also approved the district court's requirement that limited the number of cases handled by each social worker to twenty-four and required the Department of Social Services to assign each case to a social worker within twenty-four hours at its receipt. *Lynch*, 719 F.2d at 512–13. The above conditions are ancillary ones intended to "ensure prospective compliance" with the case plan and review requirements. *Id.* at 512.

The court will follow the analysis established by the Supreme Court in *Pennhurst* when determining whether the claimed rights are enforceable. Statutes "enacted pursuant to the spending power," such as the AAA, are "much in the nature of ... contract[s]; in return for the federal funds, the States agree to comply with federally imposed conditions." *Pennhurst*, 451 U.S. at 17, 101 S.Ct. at 1540. "The legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.' ... [t]here can ... be no knowing acceptance if a State is

unaware of the conditions or is unable to ascertain what of it." *Id.* (citations omitted).

In this case, the AAA "amended Title IV of the Social Security Act and 'sought to provide the states with fiscal incentives to encourage a more active and systematic monitoring of children in the foster care system.'" *Scrivner*, 816 F.2d at 263, *quoting Vermont Department of Social and Rehabilitative Services v. United States Department of Health and Human Services*, 798 F.2d 57, 59 (2d Cir.1986), *cert. denied*, 479 U.S. 1064, 107 S.Ct. 950, 93 L.Ed.2d 999 (1987). A state is "afforded considerable flexibility in unilaterally developing administrative procedures compatible with its own unique foster care circumstances" as long as it complies with case plan, status review, and dispositional hearing requirements as set forth in 42 U.S.C. § 675. *Scrivner*, 816 F.2d at 263; *Vermont*, 798 F.2d at 60.

■ The court finds that the plaintiffs' claimed rights are not enforceable for the following reasons. Some of these rights, such as the right to be placed "in the least restrictive, most family like setting" and the right to have DCFS make "reasonable efforts to reunify families," are amorphous and not subject to precise definition. *See Pennhurst*, 451 U.S. at 24–25, 101 S.Ct. at 1544 ("It is difficult to know what is meant by providing 'appropriate treatment' in the 'least restrictive' setting"). Another right, the right to "meaningful sibling visitation," is not mentioned within the statute although it seems consistent with the statute's purpose. Given the uncertain nature of these rights and the fact that at least one of them is not even found within the statute, the court finds that Congress did not "unambiguously" express its intent to condition the grant of federal funds on the state's compliance with the above "contractual terms." *Id.* at 17, 24, 101 S.Ct. at 1539–40, 1543. In addition, the court finds for the above reasons that the state did not "knowingly" accept these "terms" of the contract. *Id.* at 17, 101 S.Ct. at 1540.

The court's conclusion should not be understood as allowing the defendants to ignore the language of the statute. *See* 42 U.S.C. §§ 671(a)(15), 671(a)(16), 675(5)(A). Rather, the court holds that any rights contained in these provisions may not be enforced through a § 1983 action. *See Scrivner*, 816 F.2d at 264 (the AAA "does not create a right to meaningful visitation enforceable under § 1983"); *B.H.*, 715 F.Supp. at 1402 (no enforceable rights to family reunification services or meaningful visits between siblings under the AAA). The defendants are allowed flexibility in developing administrative procedures to pursue these objectives. *See Scrivner*, 816 F.2d at 263. Consequently, the defendants' motion to dismiss Count III of the complaint will be granted because the plaintiffs' have failed to allege the violation of any enforceable rights under the AAA.

### Conclusion

For the foregoing reasons, the court denies the defendants' motion to dismiss Counts I and II and grants the motion to dismiss Count III. The plaintiffs' motions for class certification and for a preliminary injunction will be discussed at the pretrial settlement conference on September 13, 1989 at 9:00 a.m. This case, in the court's opinion, is ripe for settlement. The defendants are obligated to act in the best interest of the child plaintiffs because they are wards of the state. It seems beyond question that establishing a policy which facilitates sibling visitation would be in the plaintiffs' best interest. The parties are directed to pursue settlement negotiations and to develop settlement proposals prior to the pretrial conference.